IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DEBBIE L. HESHLEY,

      Plaintiff,

vs.                                        Civ. No. 13-00809 MCA/SCY

THE CITY OF ALBUQUERQUE,

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

This case is before the Court upon Defendant's Motion for Summary Judgment [Doc. 39]. The Court has considered the parties' written submissions, the record in this case, and the applicable law, and is otherwise fully advised.

**Summary Judgment Standards**

Fed. R. Civ. P. 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." As our Court of Appeals has succinctly stated:

> A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented.

1

A*damson v. Multi Cmy. Diversified Serv., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

The factual record and reasonable inferences therefrom are viewed in the light most

favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150

F.3d 1271, 1274 (10th Cir. 1998).  It is not [the court's] province at the summary

judgment stage to weigh the evidence or to make credibility determinations. *Sanders v.*

*Southwestern Bell Tel., L.P.*, 544 F.3d 1101, 1105-06 (10th Cir. 2008).

**Background**

Viewing the record in the light most favorable to Plaintiff, as the nonmovant, the

Court concludes that a reasonable jury could find as follows:

Plaintiff was first employed by Defendant as a service aide, beginning in April

1985.  Thereafter, she attended the New Mexico Law Enforcement Academy, graduating

in 1988.  After graduation, Plaintiff was employed by Defendant as a commissioned law

enforcement officer until January 2008, when she retired.  Plaintiff was rehired by

Defendant in January 2009.

In the early morning of February 4, 2012, Plaintiff, along with several male

officers, responded to a fight outside a Downtown Albuquerque bar.  In the rush of action,

Plaintiff failed to turn on her lapel camera as required by APD SOP 1-39-1A.1 and -1A.2.

In the course of the ensuing melee, Plaintiff handcuffed a previously pepper-sprayed

woman who was resisting arrest.  The woman continued to resist after being handcuffed.

To control the detainee, Plaintiff slapped her once in the face, causing the detainee's nose

to bleed.  Plaintiff's use of force was consistent with the training Plaintiff had received at

the NMLEA. [Doc. 42-1 at 17]  Upon placing the detainee in her patrol car, Plaintiff called for medical assistance for the detainee.

The February 4, 2012 melee was investigated by Sgt. Belinda Mock of APD's Internal Affairs Unit.  Sgt. Mock completed her investigation and submitted it to Internal Affairs Lieutenant Michael Miller in April 2012.  [Doc. 40-1 at 7] Lt. Miller recommended sustaining allegations that Plaintiff had violated APD SOPs by not employing her lapel camera, by using excessive force, and by delaying calling for medical care for the detainee.  [Doc. 40-1 at 7]  On April 13, 2012, Plaintiff's supervisor, Commander Macario Page recommended sustaining the first and second charges, but found the third charge to be unfounded.  [Doc. 40-1 at 8-9]  Cmdr. Page recommended an 8 hour suspension and additional training on the use of force.  On May 16, 2012, Deputy Chief Banks reviewed the Internal Affairs report and concurred in the finding of an improper use of force.  Deputy Chief Banks recommended 16 hours suspension with 8 held in abeyance, plus refresher training on use of force.   On May 18, 2012, Chief Schultz concurred in the Internal Affairs findings.  Chief Schultz determined that Plaintiff's punishment should be a 120-hour suspension. [Doc. 40-1 at 8]

On Thursday, May 24, 2012, Plaintiff attended an APD Maintenance of Effort training session.  Plaintiff arrived late, which Cmdr. Page noticed. [Doc. 40-1 at 2-3] Attendees were not required to wear a uniform and were permitted to wear civilian clothes.  Plaintiff wore a camisole with a lace top and black stretchy pants underneath a black "tunic-type shirt with kind of a V neck." [Doc. 40-2 at 3]  Plaintiff's clothing was "casual business," and would have been appropriate for court or church. [Doc. 40-2 at 4]

3

APD Lieutenant William Roseman was distracted by Plaintiff's breasts. [Doc. 40-1 at 3] During a break, Lt. Roseman approached Plaintiff from behind with a cellphone in his hand.  When Plaintiff turned to see who was approaching, Lt. Roseman, who was about three or three-and-a-half feet from Plaintiff, aimed his cellphone camera at Plaintiff's chest and took a photograph of Plaintiff.  Lt. Roseman showed the photo to several commanders, including Cmdr. Page.  As with Lt. Roseman, Cmdr. Page's attention was drawn to Plaintiff's "low-cut shirt that revealed her cleavage."  [Doc. 40-1 at 3]

Plaintiff was shocked and humiliated by Lt. Roseman's actions.  She retrieved a jacket to wear over her clothing. [Doc. 40-2 at 4]  She then texted her immediate supervisor, Sergeant Jennifer Perez, to tell her what had happened. [Doc. 40-2 at 4] Sgt. Perez suggested that they postpone discussing the incident until their next working day so that they could speak face-to-face, rather than over the phone. [Doc. 40-3 at 9] During their next shift together on Saturday, May 26, Plaintiff and Sgt. Perez discussed what had occurred at the May 24 MOE. [Doc. 40-3 at 9]   Sgt. Perez felt that Lt. Roseman had acted inappropriately. [Doc. 42-6 at 7] The situation was difficult for Sgt. Perez because she was outranked by Lieutenant, later Commander, Roseman, the alleged offender. [Doc. 42-6 at 9]  Sgt. Perez called her immediate supervisor, Lieutenant Mark Garcia.  Lt. Garcia proposed that he and Sgt. Perez meet with Plaintiff the next day, Sunday, May 27.

On the evening of Sunday, May 27, Plaintiff, Sgt. Perez, and Lt. Garcia met in Lt. Garcia's office.  [Doc. 40-3 at 9] Plaintiff explained what had happened at the May 24 MOE.  After listening to Plaintiff's version of events, Lt. Garcia responded that Plaintiff

4

dresses "sleazy" and that he had seen her dress sleazy before.  Lt. Garcia's remarks

shocked Sgt. Perez, leaving her uncomfortable and causing her to wonder if Lt. Garcia

meant his remark as banter. [Doc. 42-6 at 3] Plaintiff was very upset by Lt. Garcia's

remarks. [Doc. 42-1 at 9]  Plaintiff denied dressing sleazy. [Doc. 42-6 at 3-4]

On May 30, 2012, Plaintiff,  Lt. Garcia and Cmdr. Page met to discuss the pending

disciplinary charges, Plaintiff's tardiness on May 24, 2012, and the photograph incident.

[Doc. 42-1 at 10; Doc. 42-4 at 2] During the meeting Cmdr. Page and Plaintiff addressed

Plaintiff's concern about Lt. Roseman having photographed her breasts. [Doc. 40-1 at 4]

Cmdr. Page told Plaintiff, who had not seen the photograph [Doc. 40-3 at 7], that he had

seen the photograph and that it included her body from her head down to her legs.  [Doc.

40-1 at 4] Using Cmdr. Page as a model, Lt. Garcia attempted to demonstrate how a cell

phone camera photograph taken from a few feet away would have captured more than just

Plaintiff's chest.  The image produced by this experiment captured Cmdr. Page from his

neck down to the top of his legs, [Doc. 42-1 at 11-12] arguably confirming Plaintiff's

suspicion that Lt. Roseman had taken a picture focusing on her breasts.  Cmdr. Page told

Plaintiff that the photo had been passed around among commanders who were eating

lunch together, but that he told Lt. Roseman to delete the picture.  Cmdr. Page told

Plaintiff that "This problem is squashed. You're not going to have any more trouble with

it." [Doc. 42-1 at 10]

On June 5, 2012, Chief Schultz conducted a pre-disciplinary hearing concerning

the charges against Plaintiff arising out of the February 4, 2012 incident.  This hearing,

which was conducted *after* Chief Schultz had made his recommendation to subject

Plaintiff to a 120-hour suspension, provided Plaintiff with an opportunity to respond to the pending charges.

Plaintiff, unsatisfied with Cmdr. Page's response to her concerns about the photograph incident, filed a complaint with APD Internal Affairs on June 5, 2012.  [Doc. 40-3 at 7]

On June 13, 2012, Chief Schultz formally notified Plaintiff of the disposition of the disciplinary charges arising out of the February 4, 2012 incident. [Doc. 42-5]  Chief Schultz sustained all three charges against Plaintiff and imposed a 120-hour suspension with 80 hours served and 40 hours held in abeyance for 6 months.  In addition, Plaintiff was required to attend a re-training on use of force and de-escalation techniques. [Doc. 40-1 at 11] On July 16, 2012, Chief Schultz wrote the director of the NMLEA to advise him of "the misconduct of Officer Debbie Heshley which may be considered grounds for denial, revocation or suspension of his [sic] police officer certification with the State of New Mexico." [Doc. 40-3 at 4]

 Meanwhile, June, July and most of August 2012 passed without Internal Affairs setting up an interview with Plaintiff concerning her June 5 complaint.  [Doc. 42-1 at 12] Plaintiff felt that she had been "completely ignored" by Internal Affairs.  On August 22, 2012, Plaintiff filed an EEOC complaint alleging sex discrimination.

Within Internal Affairs, Plaintiff's complaint was assigned to Lieutenant Michael Miller. [Doc. 40-3 at 7]  Lt. Miller interviewed Plaintiff, Lt. (now Commander) Roseman, and three witnesses who saw the photograph of Plaintiff.  [*Id.*] Cmdr. Roseman and the three witnesses described the photograph as a full-body image.  [*Id.*] Cmdr. Roseman

stated that he took the picture with the intention of reporting Plaintiff for violating the dress code.  Lt. Miller interviewed Plaintiff sometime after August 22, 2012.  Plaintiff admitted that she had not seen the photograph and had assumed it was solely of her breasts.  Plaintiff told Lt. Miller that she had been wearing a long tunic sweater and a camisole covering the V-part of her neckline.  On October 16, 2012,  Lt. Miller concluded based on his investigation that "there is not enough information to proceed with a formal case.  The case is considered closed."  Plaintiff was never told of Lt. Miller's decision  to close the case. [Doc. 42-1 at 12]

After Plaintiff filed her EEOC complaint, Lt. Garcia's treatment of Plaintiff changed.  [Doc. 42-1 at 25] Sgt. Perez viewed Plaintiff as an experienced and valuable officer, rating Plaintiff as meeting all performance expectations.  [Doc. 42-8] Nonetheless, Lt. Garcia began constantly monitoring Plaintiff, looking for any minor infraction that he could find.   Plaintiff's colleague, Officer James Ortiz, noted Lt. Garcia's targeting of Plaintiff.  Officer Ortiz observed Lt. Garcia disciplining Plaintiff for minor infractions that were ignored when committed by other officers.  Officer Ortiz noted that he suffered guilt by association with Plaintiff when he began taking calls with Plaintiff.

In December 2012 or January 2013, Plaintiff asked Sgt. Perez about attending an officer street safety training program in February 2013.  Sgt. Perez told Plaintiff that Cmdr. Page did not want Plaintiff to attend because he anticipated that the NMLEA was going to suspend her certification.  Plaintiff filed a second EEOC complaint, which alleged retaliation, on January 24, 2013.  [Doc. 40-1 at 14]  Thereafter, Cmdr. Page changed his mind.   Plaintiff attended the training.

7

**Discussion**

Plaintiff brings claims for sex discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000e, *et seq.*, and the New Mexico Human Rights Act, 1978 NMSA §§ 28-1-1, *et seq*.  Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a).  Title VII also makes it unlawful for an employer "to discriminate against any of his employees . . . because [she] has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this title."  42 U.S.C. § 2000e-3(a).   Under the NMHRA, "[i]t is an unlawful discriminatory practice for . . . an employer . . . to discriminate in matters of compensation, terms, conditions or privileges of employment  against any person otherwise qualified because of . . . sex . . . ." NMSA 1978, § 28-1-7(A).  Similarly to Title VII, the NMHRA makes it unlawful for an employer to retaliate an against an employee "who has opposed  any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding under the Human Rights Act[.]" NMSA 1978 § 28-1-7(I)(2).

"A plaintiff seeking to prove discrimination or retaliation under Title VII may do so by presenting direct evidence of discriminatory motivation.  Without direct evidence, a plaintiff must establish a prima facie case under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *Davis v. James*, __Fed. Appx. __, 2015 WL 178982 *2 (10th Cir. 2015) (citation omitted).  Similar principles govern Plaintiff's claims under the NMHRA. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149

8

(10th Cir. 2005).  The Court understands Plaintiff to be proceeding under the *McDonnell Douglas* framework.

### 1.  Discriminatory Discipline

A prima facie case of discriminatory discipline comprises (1) plaintiff's membership in a protected class, (2) imposition of discipline by the defendant employer, and (3) circumstances giving rise to an inference of discrimination.  *See Jones v. Denver Post, Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) (describing prima facie case of racially motivated discriminatory discipline).[1]  Here, there is no question that Plaintiff has satisfied the first two elements:   (1) she is a woman and (2) she was subjected to a 120-hour suspension as discipline for alleged violations of APD policies.  Plaintiff's prima facie case turns upon the sufficiency of her showing as to the third requirement.

Plaintiff has presented statistical evidence suggesting that that APD disproportionately disciplines female officers.  [Doc. 43-1] Admittedly, the statistical evidence offered by Plaintiff is rudimentary.[2]  But "statistics that are insignificant to a social scientist may well be relevant to a court."  *Pitre v. W. Elec. Co.*, 843 F.2d 1262,

---

[1] The Court rejects Defendant's formulation of Plaintiff's prima facie case, which includes an additional prong—*i.e.*, that the Plaintiff show that her job performance was satisfactory.  [Doc. 40 at 10] Moreover, even if this additional element were required in the context of discriminatory discipline, Defendant's argument that Plaintiff cannot show her job performance was satisfactory because she was guilty of using excessive force is contrary to Tenth Circuit precedent holding that evidence of the defendant's proffered reason for the adverse employment action cannot be used to defeat a plaintiff's prima facie case. *EEOC v. Horizon/CMS Healthcare Corp.*,  220 F.3d 1184, 1192-93 (10th Cir. 2000).

[2] Although Defendant might have challenged the scientific validity and significance of Plaintiff's statistical evidence, Fed. Civ. P. Rule 56(c)(2), Fed. Evid. Rule 702, Defendant merely asserted in a conclusory fashion that Plaintiff's statistical evidence is "immaterial." [Doc. 45 at 7] Defendant's materiality objection is not well taken: statistics may be used to establish a prima facie case of discrimination in a disparate treatment case.  *McAlester v. United Air Lines*, 851 F.2d 1249, 1258 (10th Cir. 1988) (upholding district court's admission of statistical comparison of the percentage of minorities terminated with their percentage in the work force). The Court further finds that for purposes of the instant motion, Defendant has waived any *Daubert-Kumho* objection to Plaintiff's statistical evidence. 11 *Moore's Federal Practice*  § 56.91[7](3d. ed. 2013).

1269 (10th Cir. 1988) (citing *EEOC v. American Nat'l Bank*, 652 F.2d 1176, 1192 (4th

Cir. 1981)).  Statistics that show disproportionately more discipline inflicted on  a

protected class of employees  is probative "because such imbalance is often a telltale sign

of purposeful discrimination."  *McAlester*, 851 F.2d at 1259.  Here, Plaintiff's evidence

shows that female officers are subjected to discipline for use of force at noticeably higher

rates than male officers.

Furthermore, according to Defendant, referral to the NMLEA follows as a matter of

course upon a finding of excessive use of force. If this policy of automatic referral were

neutrally applied, the Court would expect that rates of referral of disciplined female and

male officers would be similar.  Instead, Plaintiff's statistics show that disciplined female

officers were referred to the NMLEA at nearly twice the rate of male officers.  It thus

appears that discrimination may have been occurring in both the initial imposition of

discipline and the subsequent referral to the NMLEA.

With the exception of Sgt. Perez, Plaintiff's immediate supervisor, all of Plaintiff's

supervisors were male.  Decisions to impose discipline appear to have been left to the

largely subjective judgment of Plaintiff's all-male supervisors.  Evidence that all the

plaintiff's supervisors were male and employed subjective standards can be suggestive of

discrimination.  *See Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir.

1996) (close scrutiny of employment decision warranted where employment criteria are

subjective and decisions makers are not members of minority group);  *Anderson v.

Douglas & Lomason Co.*, 26 F.3d 1277, 1292 (5th Cir. 1994) (noting that employment of

subjective criteria is not "discriminatory per se," but observing that  promotion systems

10

utilizing subjective evaluations by all white supervisors can be evidence of discrimination in disparate treatment racial discrimination cases); *Cornish v. City of Los Angeles Dep't of Water and Power*, 15 F.3d 1084, 1994 WL 28623 *7 (9th Cir. 1994) ("Promotional systems that use subjective evaluations by all-white supervisors provide a ready mechanism for discrimination.").   "It is worth repeating that the prima facie stage in the *McDonnell Douglas* test is not onerous." *Orr*, 417 F.3d at 1152.  The Court concludes that Plaintiff's evidence is sufficient to satisfy her burden of production as to the third prong of her prima facie case.

Turning to the second stage of the *McDonnell Douglas* analysis, the Court asks whether Defendant has articulated a reason for the discipline that "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981) (emphasis omitted)).  At this second step in the *McDonnell Douglas* analysis, "to rebut the presumption [created by the prima facie case] '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons.'" *Hicks* at 511 (quoting *Burdine*, 450 U.S. at 254).  "[The court]  need not decide that the [defendant's] proffered reason . . . is credible or sufficient.  The employer's burden is simply to demonstrate a legitimate, nondiscriminatory reason for its actions." *Cone v. Longmont United Hosp. Assoc.*, 14 F.3d 526, 530 (10th Cir. 1994) (citation omitted).  The Court concludes that a reasonable jury could find Defendant's concern that Plaintiff violated APD SOPs to be a legitimate, non-discriminatory rationale for disciplining Plaintiff.

11

The third**,** and final, stage of the *McDonnell Douglas* analysis requires the Court to consider whether the evidence of record would permit a reasonable fact finder to reject Defendant's proffered rationale as pretext and find that the discipline imposed by Chief Schultz was the result of unlawful discrimination on the basis of sex.  Evidence of pretext may take any form, as long as it permits a reasonable jury to infer that the proffered reason was not the employer's actual reason for the adverse employment action.  *See Swackhammer v. Sprint/United Mgt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007).  "Judgments about intent are best left for trial and are within the province of the jury." *Randle v. City of Aurora*,  69 F.3d 441, 453 (10th Cir. 1995).

Here, Plaintiff has come forward with evidence that the independent review by the NMLEA determined that Plaintiff did not use excessive force, the most serious charge. Based on this evidence, a jury could find that the reason proffered by Chief Schultz was not justified by the actual facts of Plaintiff's case.  This evidence, coupled with Plaintiff's statistical evidence that Chief Schultz disproportionately subjects female officers to punishment for excessive use of force, is sufficient to meet Plaintiff's burden of persuasion.  The Court will deny Defendant's motion as to Plaintiff's claim of discriminatory discipline.

## 2.    *Retaliation*

### a.    *By Chief Schultz*

To establish a prima facie case of retaliation, Plaintiff must show (1) protected activity, (2) a materially adverse action, and (3) a causal connection between the protected activity  and the adverse  action.  *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (discussing effect of *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006) on second prong of prima facie case of retaliation).  Defendant concedes that Plaintiff engaged in protected activity and that she suffered an adverse action.  [Doc. 40 at 13] Defendant argues that Plaintiff cannot demonstrate the required causal connection between her protected activity and the adverse action because Chief Schultz had decided to discipline Plaintiff  *prior to* the May 24, 2012 photograph incident and any subsequent protected activity.  The Court agrees with respect to the imposition of the 120-hour suspension. The record shows that on April 10, Internal Affairs completed its investigation of the February 4, 2012 incident.  On May 18, 2012, Chief Schultz reviewed the findings of the investigation and the recommendations of his subordinates, Cmdr. Page and Deputy Chief Banks. Chief Schultz concurred in Internal Affairs' findings. In contrast to his subordinates, who had recommended relatively modest suspensions, Chief Schultz proposed a 120-hour suspension.  The photograph incident occurred on May 24, 2012, several days *after* Chief Schultz had decided upon a 120-hour suspension.  On June 5, 2012, Chief Schultz held a *Loudermill* hearing on the disciplinary charges against Plaintiff.  That same day, Plaintiff filed a complaint with Internal Affairs regarding the May 24, 2012 photograph incident. On June 13, 2012, Chief Schultz formally notified

Plaintiff that he had sustained the three charges against her.  However, in contrast to his May 18, 2012 decision, Chief Schultz's final decision imposed a 120-hour suspension, with 80 hours to be served and 40 hours to be held in abeyance.  Obviously, a protected activity cannot cause an adverse action that occurred *prior to* the protected activity. *Kenfield v. Colo. Dep't of Pub. Health & Env't.*, 557 Fed. Appx. 728, 733 (10th Cir. 2014) ("By its very nature, retaliatory conduct must come *after* the protected activity."); Lindemann & Grossman, *Employment Discrimination Law* 1041 (4th ed.) (observing that "[n]o inference of a causal connection can be drawn where the adverse employment action began before the plaintiff engaged in protected activity").  Here, the evidence shows that Chief Schultz already had decided to sustain the charges and impose a 120-hour suspension by the time that Plaintiff's protected activity began.  Moreover, the discipline ultimately imposed by Chief Schultz was more lenient that the discipline proposed prior to Plaintiff's protected activity.  Retaliation claims under Title-VII require "but-for" causation. *Brainard v. City of Topeka*, __Fed. Appx. __, 2015 WL 150288 *6 (10th Cir. 2015).  Causation may not be based on "mere speculation, conjecture, or surmise." *Id.* (quoting *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014))  (internal quotation marks omitted).  Under this standard, Plaintiff's evidence is insufficient to permit a reasonable jury to find that she would not have been disciplined for the February 4, 2012 incident but for her complaints about the May 24, 2012 photograph incident.

Plaintiff suffered a further adverse action:  Chief Schultz's referral of the disciplinary charges to the NMLEA for possible decertification. The Court concludes that in view of the extremely serious potential consequences to Plaintiff of the referral—

14

possible decertification— a jury could find Chief Schultz's referral to have been "materially adverse"—*i.e.*, sufficient to have dissuaded a reasonable employee from bringing a charge of sex discrimination. *Burlington*, 548 U.S. at 68. This action occurred on July 16, 2012, *after* Plaintiff had engaged in protected activity. Due to the close temporal proximity between Plaintiff's protected activity and the July 16, 2012 referral, an inference of retaliatory animus is appropriate. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 804 (10th Cir. 2007) (finding causal connection where adverse action occurred within a month of last protected activity). The Court concludes that Plaintiff has made out a prima facie case of retaliation with respect to the July 16, 2012 referral.

Turning to the second stage of the *McDonnell Douglas* analysis, the Court concludes that Defendant has articulated a legitimate, nondiscriminatory rationale for the referral. Chief Schultz has stated under oath that he referred Plaintiff to the NMLEA because the APD is required by law to report use of force incidents of a serious nature. [Doc. 40-2] Although NMSA 1978, § 29-7-13, the statute cited by Defendant, would not of itself have required Chief Schultz to report Plaintiff to the NMLEA, the implementing regulations, NMAC 10.29.1.11(C) and (E), do impose an affirmative obligation to report to the director of the NMLEA "acts of violence or brutality which indicate that the officer has abused the authority granted to him or her as a commissioned law enforcement officer in the state of New Mexico." These regulations provide a legitimate, non-discriminatory rationale for Chief Schultz's reporting to the director of the NMLEA his finding that Plaintiff employed excessive force against a handcuffed detainee.

Turning to the third stage, the Court concludes that Plaintiff has made out a submissible case that Chief Schultz's reliance on § 29-7-13 and the implementing regulations was pretextual.  First, there is evidence that Plaintiff did not employ excessive force.  Second, although Chief Schultz was required by law to report Plaintiff to the director of the NMLEA, Plaintiff's statistical evidence would permit a reasonable jury to infer that Chief Schultz did not apply this facially-neutral policy even-handedly to male and female officers.  Third, the implementing regulations are not purely objective and allow Chief Schultz latitude to rely on his subjective judgment in deciding whether an officer's conduct warrants referral to the NMLEA. Fourth, there is Plaintiff's prima facie case.

The Court concludes that Plaintiff has come forward with evidence that would allow a reasonable jury to find that Chief Schultz would not have referred Plaintiff to the NMLEA but-for her protected activity.  *Hicks*, 509 U.S. at 511 ("the factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

### b. By Lt. Garcia

As noted above, to establish a prima facie case of retaliation, Plaintiff must show (1) protected activity, (2) a materially adverse action, and (3) a causal connection between the protected activity and the adverse action.

As to the first element, the Court finds that Plaintiff engaged in protected activity by complaining to her superiors, filing an Internal Affairs complaint and filing her August 22, 2012 EEOC charge.  "Protected opposition can range from filing formal charges to

16

voicing informal complaints to superiors." *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

As to the second element, Plaintiff has come forward with evidence that Lt. Garcia's behavior toward Plaintiff materially changed after she protested the May 24, 2012 photograph incident.  Prior to Plaintiff's complaint about the photograph incident, Plaintiff and Lt. Garcia, who attended the NMLEA at the same time, appear to have had a collegial, if not particularly close, relationship.  At the meeting held to address Plaintiff's complaint about Lt. Roseman taking a photograph of her breasts, Lt. Garcia accused Plaintiff of dressing "sleazy," humiliating Plaintiff in front of Sgt. Perez.  Thereafter, Lt. Garcia began checking Plaintiff's time sheets, including past time sheets, questioning Plaintiff's timekeeping.  [Doc. 42-1 at 21] In mid-October 2012, Lt. Garcia insisted that Sgt. Perez issue a written reprimand, rather than a verbal reprimand, as discipline for Plaintiff's having arrived two minutes late to a sales presentation.  On other occasions Lt. Garcia verbally disciplined Plaintiff for being late, but did not discipline other officers in Plaintiff's squad when they were late. [Doc. 42-1 at 22] It became apparent to fellow squad member, Officer James Ortiz that Lt. Garcia would "target [Plaintiff] for any minor infraction he could find." Officer Ortiz noticed a shift in Lt. Garcia's attitude toward Ortiz himself when Officer Ortiz began taking calls with Plaintiff.  Lt. Garcia began to give Officer Ortiz more discipline when he worked with Plaintiff. [42-9 at 1]  The materiality of allegedly retaliatory employer action must be judged in context, and from the viewpoint of a reasonable worker.  *Burlington*, 548 U.S. at 69.  The Court concludes that a jury could view Lt. Garcia's conduct as more than "normally petty slights, minor annoyances, and

17

simple lack of good manners," *Burlington*, 548 U.S. at 68 (citing examples of employer actions unlikely to deter activity protected by Title VII), and find that his allegedly retaliatory actions might have dissuaded a reasonable employee from complaining about sex discrimination.[3]

The final element of a prima facie case is causation. Construing the record most favorably to Plaintiff, the Court concludes that a jury could find that Lt. Garcia's behavior toward Plaintiff became hostile only after Plaintiff complained about the May 24, 2012 photograph incident. During the period that Lt. Garcia targeted Plaintiff's performance, Plaintiff received a highly favorable review of her work from her female immediate supervisor, Sgt. Perez. [42-8] From this evidence a jury could find that it was Lt. Garcia's attitude, not Plaintiff's performance on the job, that materially changed, and that this change in attitude began in close temporal proximity to Plaintiff's complaint about Lt., Roseman's behavior. The Court concludes that Plaintiff's evidence would permit a reasonable jury to find for her on the third element of her prima facie case.

Turning to the second prong of the *McDonnell Douglas* analysis, the Court asks whether Defendant has identified a legitimate, nondiscriminatory rationale and supported that rationale with sufficient evidence from which a reasonable jury could find that the identified legitimate, nondiscriminatory rationale was the reason for the adverse action. *Hicks*, 509 U.S. at 507 (observing that "'defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier*

---

[3]The Court assumes that the Supreme Court's reference to a "reasonable worker" allows a jury to draw on its collective experience of the interpersonal dynamics of the workplace, including jurors' interactions with supervisors. A reasonable jury could find that a reasonable employee might forgo a complaint of sex discrimination to avoid having a congenial supervisor turn into a hostile hypercritical micromanager.

*of fact*, would support a finding that unlawful discrimination was not the cause of the employment action") (quoting *Texas Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981)).

Title VII's definition of "employer" includes a supervisor, such as Lt. Garcia, who exercises significant control over the plaintiff's conditions of employment. *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993). "[T]he [supervisor] operates as the alter ego of the employer, and the employer is liable for the unlawful employment practices of the [supervisor] without regard to whether the employer knew of the [supervisor's] conduct." *Id.* Further, a disparate treatment claim turns on the employer's subjective intent to discriminate. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003). Thus, at the second step of the *McDonnell Douglas* framework, the Court's focus is on Lt. Garcia's subjective state of mind during the time that he targeted Plaintiff's work performance. The most straightforward way for Defendant to have met its burden would have been by submitting the sworn statement of Lt. Garcia identifying the legitimate nondiscriminatory reasons for targeting Plaintiff's performance subsequent to her complaints about Lieutenant, subsequently, Cmdr. Roseman.[4] As it is, the record does not contain any evidence of Lt. Garcia's subjective state of mind. Defendant's evidence would require a jury that believes Plaintiff's evidence that Lt. Garcia began targeting Plaintiff subsequent

---

[4]Defendant, of course, does not have to articulate a nondiscriminatory reason for its actions to prevail *at trial*; Defendant may simply challenge Plaintiff's prima facie case—for example, by persuading the jury that Lt. Garcia did not target Plaintiff. *See Hicks*, 509 U.S. at 509-10 ("If the defendant has failed to sustain its burden but reasonable minds could *differ* as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact *does* remain, which the trier of fact will be called upon to answer.").

to her protected activity to speculate as to his reasons for his change in attitude toward Plaintiff.

The Court concludes that Defendant has not met its burden of production. Because Defendant has not satisfied its burden of production, summary judgment will be denied as to Plaintiff's claim that Defendant, acting through Lt. Garcia, subjected Plaintiff to retaliation for engaging in protected activity.

### c.    By Cmdr. Page

Plaintiff alleged in her January 24, 2013 EEOC complaint that Cmdr. Page retaliated against her by not allowing her to attend a street safety training program. [Doc. 40-1 at 14]  There is no dispute that Plaintiff attended the February 2013 street safety program.

Plaintiff clearly satisfies the first element of a prima facie case:  she engaged in protected conduct by protesting Lt. Roseman's conduct.  It is less clear whether Plaintiff has satisfied the second element.  Plaintiff's evidence is that Cmdr. Page initially denied permission for Plaintiff to attend, but relented after Plaintiff filed her second EEOC complaint.  The legal question presented by this factual scenario is whether the initial denial amounted to a material adverse action.  The Court need not answer this question, because the Court concludes that Plaintiff cannot satisfy third element of her prima facie case: causation.  The last protected conduct by Plaintiff prior to the initial denial of her request occurred on August 22, 2012, when Plaintiff filed her initial EEOC complaint. Plaintiff testified that the training occurred at the end of February 2013 and she would have made her request at least six weeks prior to the training. [Doc. 42-1 at 25-26]

Assuming that Plaintiff made her request as early as the second half of December 2012, the more than three month gap between Plaintiff's last protected activity and Cmdr. Page's initial denial of Plaintiff's request to attend the street safety training is too protracted for the Court to afford Plaintiff an inference of causation.  *Hanson v. Colorado Jud. Dep't*, 564 Fed. Appx. 916, 920 (10th Cir. 2014).  Moreover, Plaintiff has no additional evidence suggesting that Cmdr. Page bore retaliatory animus toward Plaintiff.  Plaintiff has not made out a prima facie case that Cmdr. Page initially denied  Plaintiff permission to attend the street safety training as retaliation for Plaintiff's protected activity.

### 3.    *Hostile Work Environment*

To establish a hostile work environment claim, Plaintiff must show: "(1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment."  *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012) (quoting *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009)) (internal quotation marks omitted).  "Under Title VII, harassment is actionable only when it is 'sufficiently severe or pervasive' such that a reasonable person would find the work environment to be hostile or abusive and the employee in fact perceived it to be so."  *Debord v. Mercy Health System Kan., Inc.*,  737 F.3d 642, 650 (10th Cir. 2013).

Plaintiff's hostile environment claim arguably is supported by the following evidence:  (1) the May 24, 2012 photograph incident, (2) Lt. Garcia's statement that Plaintiff wears "sleazy" civilian clothes,  (3) Cmdr. Page and Lt. Garcia's dismissive

21

attitude toward Plaintiff's concerns about the photograph incident, (4) Lt. Garcia's pattern of excessive and discriminatory criticism of Plaintiff, (5) the discriminatory discipline imposed by Chief Schultz, and (6) the discriminatory referral to the NMLEA.

Of these grounds, numbers 5 and 6 each arguably amounts to a discrete, or stand-alone, violation of § 2000e-2(a)(1).  With respect to these grounds, the Court agrees with the Court of Appeals of the D.C. Circuit:

> But we find no authority for the idea that particular acts cannot as a matter of law simultaneously support different types of Title VII claims, and of course, plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct.  Thus, although a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard, neither can a court dismiss a hostile work environment claim merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own.

*Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).

Ground number 4 presents a different conceptual issue. "The substantive provision [42 U.S.C. § 2000e-2(a)(1)] seeks to prevent injury to individuals based on who they are, *i.e.*, their status.  The antiretaliation provision [42 U.S.C. § 2000e-3] seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct."  *Burlington*,  548 U.S. at 63.  Obviously, a work environment permeated by retaliatory harassment can seem "hostile" to an employee who is being harassed; but because hostile work environment and  retaliation claims arise under different provisions of Title VII, the Supreme Court has developed separate standards for evaluating  § 2000e-2(a)(1) hostile work environment claims and § 2000e-3 retaliation claims.  It is not at all clear to the Court that Congress envisioned a hybrid hostile environment claim in which liability is

established by aggregating class-based harassment and retaliatory harassment.  Tenth
Circuit precedent suggest that facially gender-neutral harassment may be used to
establish a hostile work environment only if the plaintiff has other evidence that would
permit a reasonable jury to infer that all of the harassment—overtly gender-based and
facially gender-neutral conduct—to be the product of sex or gender animus. *Chavez v.
New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005).  Lt. Garcia's statement to Plaintiff that
she dresses in "sleazy" civilian clothes supports an inference that prior to May 27, 2012,
Lt. Garcia may have harbored sexist opinions about Plaintiff.  Yet, there is no evidence
that prior to May 27, 2012 Lt. Garcia's opinions interfered with his relationship as her
supervisor. As the Court has previously noted, Lt. Garcia's relationship with Plaintiff
soured only after Plaintiff engaged in protected conduct, a temporal relationship that the
Court relied on in finding that Plaintiff had made out a prima facie case of retaliatory
animus.  The question the Court must answer is whether Plaintiff has come forward with
evidence that would allow a reasonable jury to conclude that Lt. Garcia was motivated by
sexual animus as well as retaliatory animus.   If not, evidence of Lt. Garcia's post-May
27, 2012 conduct should be set aside in evaluating the sufficiency of Plaintiff's evidence
of a hostile work environment.  Plaintiff has not come forward with evidence that Lt.
Garcia has discriminated against her on the basis of sex other than the "dresses sleazy"
comment and his dismissal of Plaintiff's complaints about the photograph incident.
There is no evidence that Lt. Garcia has made statements derogative of female officers or
otherwise discriminated against any other female.   Stated in terms of a plaintiff's prima

facie case,[5]  Plaintiff has failed to make out a submissible case that the allegedly undeserved scrutiny of her performance by Lt. Garcia occurred under circumstances giving rise to an inference that Lt. Garcia imposed the discipline because of sex or gender-based animus.

With Lt. Garcia's conduct set aside except as background, Plaintiff's evidence of a hostile work environment consists of the following:  (1) the May 24, 2012 photograph incident, (2) Lt. Garcia's statement that Plaintiff wears "sleazy" civilian clothes,  (3) Cmdr. Page and Lt. Garcia's dismissive attitude toward Plaintiff's concerns about the photograph incident, (4) the discriminatory discipline imposed by Chief Schultz, and (5) the discriminatory referral to the NMLEA.  This conduct occurred within an approximately seven-week period, from May 24, 2012 to July 16, 2012.  While this conduct is hardly "pervasive," the test for a hostile work environment is disjunctive:  the conduct must be severe *or* pervasive.  The 120-hour suspension and the referral to the NMLEA reasonably can be viewed as "severe."

The Court concludes that Plaintiff has come forward with evidence that would permit a reasonable jury to find that between May 24, and July 16, 2012, Plaintiff was subjected to a work environment that was both objectively and subjectively hostile.

**Conclusion**

The Court **grants** Defendant's Motion for Summary Judgment as it applies to Plaintiff's claims that (1) Defendant, acting through Chief Schultz, imposed discipline in

---

[5] The other two elements being (1) Plaintiff is a member of a protected class and (2) Plaintiff was subjected to severe or pervasive harassment.

retaliation for protected conduct and (2) that Defendant, acting through Cmdr. Page, initially denied Plaintiff's request to attend officer safety training in retaliation for protected activity.  The Court **denies** Defendant's Motion for Summary Judgment as it applies to Plaintiff's claims that (1) Defendant, acting through Chief Schultz, subjected Plaintiff to discriminatory discipline and discriminatory referral to the NMLEA, (2) Defendant, acting through Chief Schultz, referred Plaintiff to the NMLEA in retaliation for protected activity, (3) Defendant, acting through Lt. Garcia,  subjected Plaintiff to unwarranted scrutiny of her performance in retaliation for protected activity, and (4) Defendant, acting through Chief Schultz, Cmdr. Page, Lt. Garcia, and Lt. Roseman, subjected Plaintiff to a hostile work environment between May 24 and July 16, 2012.

**WHEREFORE, IT HEREBY IS ORDERED** that Defendant's Motion for Summary Judgment [Doc. 39], is **granted in part and denied in part**.

So ordered this 27th day of March, 2015.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge